IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF NORTH CAROLINA *ex rel*. NINA SCHERER,<br><br>    Plaintiffs<br><br>    v.<br><br>UNIVERSAL HEALTH SERVICES, INC.; KEYSTONE WSNC, LLC dba OLD VINEYARD BEHAVIORAL HEALTH SERVICES,<br><br>    Defendants. | Case No. 1:23-CV-387 |

**UNITED STATES' STATEMENT OF INTEREST REGARDING
DEFENDANTS' MOTION TO DISMISS
BASED ON ALLEGED UNCONSTITUTIONALITY OF
THE *QUI TAM* PROVISIONS OF THE FALSE CLAIMS ACT**

The False Claims Act (FCA), 31 U.S.C. §§ 3729-3733, is the federal government's primary tool to combat fraud and recover losses due to fraud in federal programs. Accordingly, the United States has a substantial interest in the proper interpretation of the FCA. The United States also administers government programs under various statutory and regulatory schemes and therefore has a substantial interest in the proper interpretation of the statutes, regulations, and guidance that govern and impact the enforcement of those schemes. The United States submits this Statement of Interest, pursuant to 28 U.S.C. § 517, to address arguments relating to the constitutionality of the FCA's *qui tam* provisions that

1

the Defendants challenge in their Motion to Dismiss Relator's Complaint. Dkt. 34.[1] This Statement of Interest addresses only Defendants' constitutional challenges. The United States takes no position on the other arguments raised by Defendants in their Motion to Dismiss.

## ARGUMENT

Defendants argue that Relator's litigation of this declined *qui tam* case violates the Appointments Clause, Take Care Clause, and Vesting Clause of Article II of the U.S. Constitution. It does not.

Every court of appeals to have addressed the question has held that the False Claims Act's *qui tam* provisions are consistent with Article II. *See United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 804-807 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753–58 (5th Cir. 2001) (en banc); *United States ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1040–42 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.,* 9 F.3d 743, 749–59 (9th Cir. 1993); *see also United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1155 (2d Cir. 1993) (explaining, in rejecting an Article III challenge, that the *qui tam* "provisions do not usurp the executive branch's litigating function"). Defendants acknowledge this authority but

---

[1] If the Court does not plan to reject the constitutional challenge, the United States requests that the Court certify the question to the Attorney General pursuant to Federal Rule of Civil Procedure 5.1(b) and 28 U.S.C. § 2403(a) so that the Attorney General has the opportunity to consider whether to intervene in the action. *See* Fed. R. Civ. P. 5.1(c) (district court can "reject [a] constitutional challenge" without affording the government an opportunity to intervene, but cannot "enter final judgment holding [a] statute unconstitutional" without providing that opportunity).

dismiss it as non-binding and then support their own position by relying on an out-of-circuit district court decision, *United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, 751 F. Supp. 3d 1293 (M.D. Fla. 2024), *appeal docketed*, No. 24-13581, 24-13583 (11th Cir. Oct. 30, 2024), language from concurring and dissenting opinions in two Supreme Court cases, once of which held that the United States has broad authority to dismiss an FCA action in which it has intervened, *see United States ex rel. Polansky v. Executive Health Resources*, 599 U.S. 419, 428-39 (2023) (Thomas, J., dissenting) and *Wisconsin Bell, Inc. v. U.S. ex rel. Heath*, 145 S. Ct. 498, 515 (2025) (Kavanaugh & Thomas, JJ., concurring), and cases involving statutes other than the FCA. Contrary to Defendants' arguments, the overwhelming persuasive authority holds that the longstanding *qui tam* provisions of the FCA are constitutional.

Indeed, almost all district courts, including those within the Fourth Circuit, have upheld the constitutionality of the FCA *qui tam* provisions. *See, e.g.*, *United States ex rel. Phillips v. Pediatric Servs of Am., Inc.*, 123 F. Supp.2d 990 (W.D.N.C. 2000); *United States ex rel. Taylor v. Healthcare Assoc. of Tex.*, No. 3:19-CV-2486-N, 2025 WL 1885642, at *6 (N.D. Tex. July 8, 2025); *United States ex rel. Gonite v. UnitedHealthcare of Ga., Inc.*, No. 5:19-CV-246 (MTT), 2025 WL 1184109, at *3-4 (M.D. Ga. Apr. 23, 2025); *United States ex rel. Penelow v. Janssen Prods., LP*, No. CV 12-7758 (ZNQ) (JBD), 2025 WL 937504, at *12 (D.N.J. Mar. 28, 2025); *United States ex rel. Butler v. Shikara*, No. 20-80483-CV, 2024 WL 4354807, at *11–13 (S.D. Fla. Sept. 6, 2024); *United States ex rel. Resolution NJ LLC v. Riverside Medical Group, P.C.*, No. 2:22-cv-4165, 2024 WL

4100372, at *5 (D.N.J. Sept. 6, 2024); *United States ex rel. CLJ, LLC v. Halickman*, No. 20-CV-80645, 2024 WL 3332055, at *21 n.5 (S.D. Fla. June 14, 2024); *United States ex rel. Wallace v. Exactech, Inc.*, No. 7:18-cv-01010-LSC, 2023 WL 8027309, at *4 (N.D. Ala. Nov. 20, 2023); *United States ex rel. Thomas v. Mercy Care et al.*, 2023 WL 7413669 (D. Ariz., Nov. 9, 2023); *United States ex rel. Miller v. Manpow*, 2023 WL 8290402 (C.D. Cal. Aug. 30, 2023); *United States v. Halifax Hosp. Med. Ctr.*, 997 F. Supp. 2d 1272, 1278 (M.D. Fla. 2014); *United States ex rel. Butler v. Magellan Health Servs., Inc.*, 74 F. Supp. 2d 1201, 1212 (M.D. Fla. 1999); *but see Zafirov*, 751 F. Supp. 3d at 1322.[2]

This Court should likewise reject Defendants' arguments that the *qui tam* provisions of the False Claims Act are unconstitutional.

### I. Relators Need Not Be Appointed In The Manner Prescribed By The Appointments Clause

Defendants contend that the False Claims Act's *qui tam* provisions are inconsistent with the Appointments Clause, which specifies the permissible means of appointing "Officers of the United States" to public offices "established by Law." U.S. Const. art. II, § 2, cl. 2; *see* Dkt. 35 at 43-48. However, relator possesses none of the indicia of officeholders within the meaning of the Appointments Clause: Her role is limited in time and scope, confined to a particular case, and fundamentally personal in nature.

---

[2] An appeal in *Zafirov* is pending before the Eleventh Circuit (Nos. 24-13581, -13583).

4

### A. Relators Do Not Occupy Continuing Positions

To be an "Officer of the United States" subject to the Appointments Clause, a person "must occupy a 'continuing' position established by law." *Lucia v. SEC*, 585 U.S. 237, 245 (2018). This requirement comes from the Supreme Court's decision in *United States v. Germaine*, 99 U.S. 508 (1879), which "held that 'civil surgeons' (doctors hired to perform various physical exams) were mere employees because their duties were 'occasional or temporary' rather than 'continuing and permanent.'" *Lucia*, 585 U.S. at 245 (quoting *Germaine*, 99 U.S. at 508, 511-512). A hallmark of an office is that its "duties continue, though the person" occupying it "be changed." *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15,747) (Marshall, C.J.). Relators' roles, in contrast, are limited in time and scope rather than continuing from officeholder to officeholder over time, and Defendants have not shown otherwise.

Defendants assert that relators are like the independent counsel or bank receivers that have been found to be officers. Dkt. 35 at 48; *see Morrison v. Olson*, 487 U.S. 654, 671 n.12 (1988) (independent counsel); *United States v. Weitzel*, 246 U.S. 533, 541 (1918) (bank receiver); *see also United States v. Donziger*, 38 F.4th 290 (2d Cir. 2022). But unlike relators' roles, these roles were not specific to the individuals appointed to perform them. These offices were continuing in the crucial sense that their "duties" would "continue" even "though the person" performing them "be changed." *Maurice*, 26 F. Cas. at 1214. As the Supreme Court explained, Alexia Morrison was not even the first person to hold her independent counsel office: The court that appointed her had initially appointed James

5

McKay, who had resigned and been replaced by her. *Morrison*, 487 U.S. at 667. Ms. Morrison's role was thus clearly "continuing" even though it was not permanent. Similarly, the duties of a bank receiver were not limited to performance by a single individual. *See Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. at 111. If a given person appointed to act as a receiver became unable to perform his duties, that would not negate the need for a receivership; it would simply require the appointment of another receiver in place of the first. In *Stanton v. Wilkeson*, 22 F. Cas. 1074 (S.D.N.Y. 1876), another bank-receiver case, the court made this point clear when explaining that "[v]acation of office by the comptroller" of the currency, who delegated authority to the receiver, would not "vacate the receivership." 22 F. Cas. at 1074–75. And in *Donziger*, the Second Circuit—citing *Maurice*—specifically based its ruling on the premise that "the individuals appointed as special prosecutors could be replaced without the duties of the positions terminating." 38 F.4th at 297.

The role of a relator is nothing like that. If a particular relator who has blown the whistle on a fraud by filing a *qui tam* action decides she is no longer interested in pursuing the action, another person cannot simply take her place as relator. The False Claims Act states expressly that "[w]hen a person brings an action under" the *qui tam* provisions, "no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5).

The essential question in determining whether the role of the relator is continuing is whether the duty—here, the duty of litigating a *particular qui tam* action—can continue

6

from inhabitant to inhabitant of that office, and it clearly cannot. A relator's pursuit of a *qui tam* action is personal to that relator and not transferable from relator to relator. Defendants contend that relators hold a continuing role "even though a relator's term will expire at the end of the *qui tam* action." Dkt. 35 at 46. But that argument misses the point. As noted above, the relevant question is whether the duties of the role can be passed from one person who occupies the role to the next. In the case of a *qui tam* relator, they simply cannot.

For example, while a relator's *qui tam* action survives her death, it may be pursued by her estate's personal representative—not a different relator—just as the estates of deceased plaintiffs routinely maintain other types of actions personal to the deceased plaintiff. *United States v. NEC Corp.*, 11 F.3d 136, 139 (11th Cir. 1993). This underscores that a relator's role is personal and unlike the duties of an actual office holder, such as an Attorney General, Ambassador, or Secretary of the Treasury, whose duties are not personal in any way and are not inherited by the official's estate if she dies. *See also United States ex rel. Spicer v. Westbrook*, 751 F.3d 354 (5th Cir. 2014) (bankruptcy trustee, as opposed to new relator, can assert False Claims Act claims belonging to relator's bankruptcy estate).

### B. Congress Did Not Vest Relators With Uniquely Governmental Authority

Relators are also not officeholders subject to the Appointments Clause because Congress envisioned their roles as fundamentally personal rather than governmental in nature. In *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000), the Supreme Court held that *qui tam* relators have Article III standing to sue

7

under the False Claims Act on the ground that the Act "can reasonably be regarded as effecting a partial assignment of the Government's damages claim" by entitling the relator to a share of any ultimate recovery. *Id.* at 773; *see United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419, 425 (2023) (same). The Supreme Court expressly rejected the theory that relators bring suit as agents of the United States. *Stevens*, 529 U.S. at 772. And in another part of the opinion holding that relators cannot pursue *qui tam* actions against States, the Supreme Court emphasized that *qui tam* actions are "private suit[s]" brought by "private parties." *Id.* at 780 n.9, 786 n.17.

*Stevens* thus recognized that when Congress authorized relators to bring *qui tam* suits under the False Claims Act, it did not intend to create a governmental office subject to the Appointments Clause. Rather, Congress was authorizing relators to pursue a personal monetary recovery—employing "the theory, based on experience as old as modern civilization, that one of the least expensive and most effective means of preventing frauds on the treasury is to make the perpetrators of them liable to actions by private persons acting … under … the hope of gain." *United States v. Griswold*, 24 F. 361, 366 (D. Or. 1885) (quoted in *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n.5 (1943); *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 949 (1997)).

That a relator brings a *qui tam* suit "in the name of the Government," 31 U.S.C. § 3730(b)(1), does not alter the nature of the relator's interest in the suit. The Supreme Court explained in *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262 (2019), that the statutory provision for *qui tam* actions to be brought "'for the [relator] and

8

for the … Government,'" and "'in the name of the Government,' … does not make the relator anything other than a private person" as opposed to an "'official of the United States.'" *Id.* at 272; *see also, e.g.*, *Taxpayers Against Fraud*, 41 F.3d at 1041 ("Although a relator may sue in the government's name, the relator is not vested with governmental power.").

The fact that relators decide whether to commence litigation by filing a *qui tam* complaint likewise does not make them governmental officeholders.  The False Claims Act provides that a *qui tam* action cannot proceed—indeed, it cannot even be unsealed—until after the government has had an opportunity to determine whether to "intervene and proceed with the action," intervene and move to dismiss it, or allow the relator "to conduct the action" subject to ongoing government oversight.  31 U.S.C. § 3730(b)(2)-(4).  This upfront review by the government makes clear that relators are not acting as government officials when they bring suit.  It is the government that determines whether the action should go forward and, if so, who should litigate it.

\*   \*   \*

Relators do not act on a continuing basis, and they do not perform a function that only the government can constitutionally perform.  Congress routinely chooses "to rely … on private enforcement to implement public policy." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 263 (1975).  And as explained below, there is abundant evidence that Congress and the courts have historically viewed private *qui tam* suits as a constitutionally permissible means of redressing and deterring violations of federal law.

9

For all these reasons, relators need not be appointed in a manner consistent with the Appointments Clause.

## II. The *Qui Tam* Provisions Do Not Violate The Vesting and Take Care Clauses

The Vesting and Take Care Clauses state that "[t]he executive power shall be vested in a President of the United States" and that the President "shall take care that the laws be faithfully executed." U.S. Const. art. II, § 3. The Defendants contend that relators exercise executive power in a manner inconsistent with these Clauses, but this Court should reject that argument too. *See* Dkt. 35 at 49.

Congress unquestionably has the power to authorize private parties who have suffered Article III injury to sue to enforce federal statutes, like Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f) or the antitrust laws, 15 U.S.C. § 15. It is long-established that Article II "does not require Congress to prescribe litigation by the Executive as the *exclusive* means of" protecting the government's interests. *Riley*, 252 F.3d at 753. Private suits under such provisions generally do not raise Article II concerns even if Congress has created a private right of action for the purpose of supplementing government enforcement actions. The Supreme Court has routinely described private suits as a means of enforcing federal statutes for the benefit of the public, not just as a means of redressing private injuries. *See, e.g.*, *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 218 (2022) ("'[P]rivate individuals may sue to enforce' … antidiscrimination statutes[.]"); *Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 502 (1969) ("Congress has encouraged private antitrust litigation not merely to compensate those who

10

have been directly injured but also to vindicate the important public interest in free competition.").

Private suits under statutes like these differ in significant respects from *qui tam* suits under the False Claims Act. *Qui tam* relators are authorized to pursue False Claims Act suits solely on the basis of the government's partial assignment of a share of its right to a monetary recovery, *see Stevens*, 529 U.S. at 773, whereas private plaintiffs under other statutes must establish a personal injury as a basis for standing. A judgment on the merits in a *qui tam* action under the False Claims Act can have claim-preclusive effect against the United States, whereas judgments in private suits under other statutes do not. And the United States receives a share (indeed, the majority) of a monetary judgment in a *qui tam* action under the False Claims Act, whereas judgments in private suits under other statutes are payable solely to the plaintiffs. If Congress's use of the *qui tam* mechanism were a new development, these features of *qui tam* actions under the False Claims Act would give rise to substantial questions about whether such actions are consistent with the Vesting and Take Care Clauses of Article II.

Those questions are resolved, however, by the extensive body of evidence that *qui tam* provisions have, since the Founding, been understood as established features of American law. As the Supreme Court observed, "[s]tatutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our [G]overnment." *Hess*, 317 U.S. at 541 n.4 (1943)

11

(quoting *Marvin v. Trout*, 199 U.S. 212, 225 (1905)). In *Stevens*, the Supreme Court reviewed this "long tradition of *qui tam* actions in England and the American Colonies," as well as the "considerable number" of statutes with *qui tam* provisions passed by the First Congress. *Stevens*, 529 U.S. at 774–77. The Supreme Court found this body of history about the deep historical roots of *qui tam* provisions "well nigh conclusive" in the Article III context, *id.* 529 U.S. at 777, and it is just as "conclusive with respect to the Article II question" raised here. *Riley*, 252 F.3d at 752; *see Stevens*, 529 U.S. at 801 (Stevens, J., dissenting); *Butler*, 2024 WL 4354807, at *11 ("[D]ecades—nay, centuries—of litigation through the use of the *qui tam* device under the [False Claims Act] undercuts [defendant's] argument" against the constitutionality of the False Claims Act's *qui tam* provisions).

This is because legislation "'passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, … is contemporaneous and weighty evidence of its true meaning.'" *Marsh v. Chambers*, 463 U.S. 783, 790 (1983); *see also Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n*, No. 22-448, 610 U.S. 416, 432 (2024) (same); *Bowsher v. Synar*, 478 U.S. 714, 723 (1986) (same). Likewise, "'traditional ways of conducting government … give meaning' to the Constitution." *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (quoting *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)).

The history here shows that *qui tam* provisions are consistent with the original understanding of Article II. The First Congress enacted "a considerable number of" *qui tam* provisions, including those that "provided both a bounty and an express cause of

12

action" for informers. *Stevens*, 529 U.S. at 776-777, 777 n.6. For example, one statute allowed "informer[s] to sue for, and receive half of [the] fine for, [a] failure to file [a] census return." *Stevens*, 529 U.S. at 777 n.6 (citing Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. at 102). Another allowed "private individual[s] to sue for, and receive half of [the] fine for, carriage of seamen without contract or illegal harboring of runaway seamen." *Id.* (citing Act of July 20, 1790, ch. 29, §§ 1, 4, 1 Stat. at 131, 133). And another allowed "private individual[s] to sue for, and receive half of [the] goods forfeited for, unlicensed trading with Indian tribes." *Id.* (citing Act of July 22, 1790, ch. 33, § 3, 1 Stat. at 137-138). The enactment of *qui tam* statutes immediately after the Founding clearly indicates that the Framers viewed them as fully compliant with Article II of the Constitution.

The Executive Branch likewise recognized *qui tam* litigation as an established feature of American law when the Attorney General included, in draft legislation in 1795, a cost-shifting provision for *qui tam* suits. *See* 1 William S. Hein & Co., *American State Papers, Class X, Miscellaneous* 117, 121 (1998) (provision for cost-shifting in suits brought by "any informer or plaintiff, on a penal statute, to whose benefit the penalty, or any part thereof, if recovered, is directed by law to accrue"), https://perma.cc/JGR5-8AQA. This suggests that the early Executive Branch also perceived no constitutional problem with *qui tam* suits.

The Supreme Court has repeatedly recognized *qui tam* provisions as common and legitimate. For example, in *Marvin v. Trout*, 199 U.S. 212 (1905), the Supreme Court commented, while upholding the constitutionality of a state *qui tam* provision, that to reach

13

a contrary conclusion "would be in effect to hold invalid all legislation providing for proceedings in the nature of *qui tam* actions," even though such statutes had "been in existence for hundreds of years in England, and in this country ever since the foundation of our government." *Id.* at 225. And in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), the Supreme Court found that a court of appeals construing the False Claims Act narrowly "on the premise that *qui tam* or informer actions 'have always been regarded with disfavor'" was wrong to do so because "*[q]ui tam* suits have been frequently permitted by legislative action" and "Congress has power to choose this method to protect the government from burdens fraudulently imposed upon it." *Id.* at 540-542. The historical record thus suggests that all three branches of the early American government accepted *qui tam* statutes as an established feature of the legal system.

Further, the False Claims Act's *qui tam* provisions provide greater means for governmental control than the early *qui tam* statutes did. As explained *supra*, the government performs an upfront review before a *qui tam* action can proceed, or even be unsealed. *See* 31 U.S.C. § 3730(b)(2)-(4). Even if the government initially declines to intervene, it may still intervene at a later time for good cause. *See* 31 U.S.C. § 3730(c)(2)(D)(3). And the government may move to dismiss a False Claims Act action over a relator's objection, subject to highly deferential review under Federal Rule of Civil Procedure 41(a). *Id.* § 3730(c)(2)(A). The Supreme Court emphasized that district courts must grant dismissal "in all but the most exceptional cases … even if the relator presents a credible assessment to the contrary." *Polansky*, 599 U.S. at 437. The government may

14

also settle a pending suit over the objections of the relator, *see* 31 U.S.C. § 3730(c)(2)(B); and veto a relator's proposed settlement or voluntary dismissal of his action, *id.* § 3730(b)(1). The United States may also stay any discovery by the relator that "would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts," *id.* § 3730(c)(4). If early *qui tam* statutes, which lacked such controls, were understood to pose no Article II problem, then the False Claims Act's *qui tam* provisions cannot be understood to pose any Article II problem either.

It is true that if relators exercised executive power, then constraints on the President's "ability to supervise and remove" relators would be unconstitutional. *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 238 (2020). But Defendants are incorrect to suggest that this renders the *qui tam* provisions unconstitutional in full and requires dismissal of the instant suit. Instead, the appropriate remedy would be to hold invalid—and sever from the rest of the *qui tam* provisions—the statutory constraints on the government's ability to control *qui tam* litigation, including 31 U.S.C. § 3730(c)(3) (requiring good cause to intervene after initial decision not to); 31 U.S.C. § 3730(c)(2)(A)-(B) (constraints on government's settlement or dismissal of action over relator's objection); and 31 U.S.C. § 3730(c)(2)(C) (relator's right to participate in litigation after government intervention). This is consistent with the Supreme Court's treatment of what it regarded as unconstitutional restrictions on the supervision of administrative patent judges in *United States v. Arthrex, Inc.*, 594 U.S. 1, 24-25 (2021), and respects the judicial obligation to "limit the solution to the problem" "when confronting a constitutional flaw in a statute,"

by "sever[ing] its problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328 (2006).

The historical context of the False Claims Act's *qui tam* provisions demonstrates that they are consistent with the Take Care Clause and the Vesting Clause and with the original understanding of Article II. Defendants' arguments to the contrary should be rejected.

## CONCLUSION

As set forth above, the False Claims Act's *qui tam* provisions are consistent with the Constitution. The Court should reject Defendants' arguments—as every federal Circuit Court to address these issues has done—and deny Defendants' motion based on the alleged unconstitutionality of the *qui tam* provisions of the False Claims Act.

This the 4th day of August, 2025.

Respectfully submitted,

CLIFTON T. BARRETT
United States Attorney

 */s/ Rebecca A. Mayer*
Rebecca A. Mayer
Assistant United States Attorney
TX Bar No. 24092376
101 South Edgeworth Street, 4th Floor
Greensboro, NC 27401
(336) 333-5351
rebecca.mayer@usdoj.gov

16

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF NORTH CAROLINA *ex rel*. NINA SCHERER,<br><br>    Plaintiffs<br><br>    v.<br><br>UNIVERSAL HEALTH SERVICES, INC.; KEYSTONE WSNC, LLC dba OLD VINEYARD BEHAVIORAL HEALTH SERVICES,<br><br>    Defendants. | Case No. 1:23-CV-387 |

## CERTIFICATE OF WORD COUNT

I certify that this Memorandum complies with the word count limit set forth in L.R. 7.3(d). The number of words in this Memorandum, exclusive of the caption, signature lines, certificate of service, and any cover page or index, according to the word count feature of the word processing software used to prepare the Memorandum, does not exceed 6,250 words.

This the 4th day of August, 2025.

>    */s/ Rebecca Mayer*
>    Rebecca A. Mayer
>    Assistant U.S. Attorney

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF NORTH CAROLINA *ex rel*. NINA SCHERER,<br><br>    Plaintiffs<br><br>    v.<br><br>UNIVERSAL HEALTH SERVICES, INC.; KEYSTONE WSNC, LLC dba OLD VINEYARD BEHAVIORAL HEALTH SERVICES,<br><br>    Defendants. | Case No. 1:23-CV-387 |

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2025, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, and that copies of the documents were served via the CM/ECF system, or by other means if specified below, on the following:

Madeline Lea Wertenberg
Special Assistant U.S. Attorney
Special Deputy Attorney General
Mlea@ncdoj.gov

John H. Lawrence
Jared Michael Burtner
K&L Gates LLP
John.Lawrence@klgates.com
Jared.Burtner@klgates.com
*Counsel for Defendants*

Andrew L. Fitzgerald
Fitzgerald, Hanna & Sullivan, PLLC
Andy@fhslitigation.com
*Counsel for Relator*

                                                */s/ Rebecca Mayer*
                                                Rebecca A. Mayer
                                                Assistant U.S. Attorney