IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and THE STATE OF NORTH CAROLINA ex rel. NINA SCHERER, | ) | |
| Plaintiff, | ) | |
| v. | ) | 1:23cv387 |
| UNIVERSAL HEALTH SERVICES, INC., et al., | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

This qui tam case is before the court on the motion to dismiss for failure to state a claim by Defendants Universal Health Services, Inc. ("UHSI") and Keystone WSNC, LLC, doing business as Old Vineyard Behavioral Health Services ("Old Vineyard"). (Docs. 45, 46.) Relator Nina Scherer brings her claims on behalf of herself, the United States of America, and the State of North Carolina, alleging violations of the federal False Claims Act, 31 U.S.C. § 3729 et seq. ("FCA") and the North Carolina False Claims Act, North Carolina General Statute § 1-605 et seq. ("NCFCA"). (Doc. 38.) Relator has responded in opposition to Defendants' motion to dismiss (Doc. 52), and Defendants have replied (Doc. 54). The United States has also filed a statement of interest. (Doc. 51.) For the reasons set forth below, Defendants' motion will be granted in part and denied in part.

## I. BACKGROUND

### A. Factual Background

The facts, as alleged in Relator's amended complaint and taken as true for purposes of Defendants' motion, show the following:

Old Vineyard is a psychiatric facility in Winston-Salem, North Carolina, offering inpatient and outpatient services. (Doc. 38 ¶¶ 27-29.) UHSI is a Fortune 500 company incorporated in Delaware with its headquarters in Pennsylvania. (Id. ¶ 19.) According to Relator, UHSI "owns Old Vineyard and dictates control over its policies and procedures." (Id. ¶ 15; see also id. ¶ 27.) Relator worked at Old Vineyard as an Outpatient Manager for about four and a half years. (Id. ¶ 17.) She also assisted physicians in inpatient settings over Zoom during the COVID-19 pandemic. (Id. ¶ 18.)

As an Outpatient Manager at Old Vineyard, Relator alleges that she learned of several fraudulent practices employed by Defendants. (Id. ¶ 59.) First, for example, Defendants' physicians met with patients for around five minutes before billing Medicare, Medicaid, Tricare, and private insurance for a Psychiatric Diagnosis Interview Examination under Current Procedure Terminology ("CPT") Code 90792, which requires a minimum of 60 minutes for an exhaustive diagnostic interview. (Id. ¶¶ 61, 64-65.) Similarly, she alleges that physicians "routinely" met with patients for three to eight minutes before billing for

medicine checks under CPT Code 90832, even though "Medicare advises not to bill [this code] for sessions less than 16 minutes[.]" (Id. ¶ 62.) Relator provides eight examples from May 28, 2020, where a physician billed under these codes despite meeting with the patient for significantly less than the required time. (Id. ¶ 67.)

Second, Relator alleges that Defendants billed for group therapy meetings under CPT Code 90853, which requires a patient's actual and full attendance, "regardless of whether the patient attended the full session." (Id. ¶ 75.) CPT Code 90853 also limits groups to 12 patients, but Defendants "at times include[d] up to 18 patients in a group." (Id. ¶ 76.) Relator states that she ran these group sessions and filled out the patients' charge sheets as a licensed professional counselor, and she provides examples of the account receivable/admission, discharge, and transfer forms generated by Old Vineyard's billing office. (Id. ¶¶ 78, 81; see Doc. 38-5.) She alleges that "[t]he claims presented on these forms were often improper[.]" (Doc. 38 ¶ 87.)

Third, according to Relator, Defendants tasked Laura Lea Harris, the utilization review manager, to deliver blank Medicare certification forms to the geriatric unit physician so that the physician could batch sign blank Medicare certification forms. (Id. ¶ 92.) Harris would then take the signed forms and date them as needed for reimbursement. (Id.) Relator alleges that the physician would not review the certification forms for the

individual patients at the time of their completion. (Id.) Further, these forms were often completed at least one week after a patient's admission, despite the requirement that certifications are due "at the time of admission or as soon thereafter" as is reasonable and practicable. (Id. ¶¶ 93-94); see 42 C.F.R. § 424.14(d). Defendants ultimately terminated Harris for "reporting concerns about Defendants' fraudulent billing practices." (Doc. 38 ¶ 95.) Moreover, Harris's replacement, Melanie Patella, resigned her position after expressing her own concerns in an email to senior leadership around 2021. (Id. ¶ 96.) Relator alleges that she also witnessed Harris and Patella backdate certifications and fail to timely secure a provider's signature on the outpatient unit, despite the requirement that a provider sign the forms and certify medical necessity within 24 hours of admission. (Id. ¶¶ 98-100.)

Fourth, Relator alleges that Defendants pre-dated and pre-signed forms by having providers certify in advance that a patient would need a further 18 days of treatment, after the initial 18 days, at the time of the patient's admission. (Id. ¶ 108.) Providers would thereby circumvent the requirement to recertify the necessity of the patient's continued care at the 18-day mark. (Id.) Relator provides an example of a completed form where the dates for the initial and Day 18 certifications are written in different handwriting, while the signatures appear identical.

(Id. ¶ 109; see Doc. 38-6.) According to Relator, this difference in handwriting indicates that the physician signed both the initial and re-certification portions of the form at one time, but another person later added the appropriate date next to the signature for re-certification. (Doc. 38 ¶ 109.) Relator alleges that Medicare does not permit a physician to certify the medical necessity of a patient's continued treatment 18 days in advance. (Id. ¶¶ 110-11.)

Fifth, Relator alleges that Harris had the geriatric unit physician sign blank certification forms "as a batch" on several occasions. (Id. ¶ 117.) Once Harris obtained the signatures, other personnel would fill out the Medicare certification forms on the dates required, without any further supervision or input from the physician. (Id. ¶¶ 120-22.) Relator personally witnessed these otherwise blank forms bearing the physician's signature, and she discussed the issue of batch certifications with Harris. (Id. ¶ 123.) According to Relator, Defendants presented these claims to the government for payment along with the "batch signed" certification forms. (Id. ¶ 126.)

Sixth, Relator alleges that senior leadership pressured Harris and Clinical Director Terrie Stout to keep patients otherwise ready for discharge if their insurance authorized more days for treatment. (Id. ¶¶ 130-31.) These extended stays therefore were not medically necessary. (Id. ¶¶ 131-32.)

According to Relator, Stout confirmed both that UHSI pressured personnel to keep patients with more authorized days, and to discharge patients whose insurance authorization had ended. (Id. ¶ 133.) One nurse practitioner also shared her experience with Relator, in which she had been pressured to discharge a suicidal patient because of a lack of insurance. (Id. ¶ 134.)

Seventh, Relator alleges that Defendants improperly billed for nursing assessments on the outpatient unit during the COVID-19 pandemic, despite not having a nurse stationed at the outpatient unit at the time. (Id. ¶¶ 139-40.) Specifically, patients did not receive nursing assessments within 24 hours after their admission, yet Defendants still submitted bills for the assessments. (Id. ¶ 141.) To facilitate this billing, Defendants either backdated the nursing assessments to falsely reflect their occurrence within the 24-hour period, or Defendants would completely falsify the reimbursement claim. (Id. ¶¶ 143-44.) Relator provides two incomplete nursing assessments for admitted patients as examples, which she contends demonstrate that the government had been billed for the patients' admission despite the lack of timely assessment. (Id. ¶¶ 145-50, 160; see Docs. 38-7, 38-9.) Further, Relator provides a completed nursing assessment form, where she alleges that somebody had initially backdated the form to May 30, 2020, to reflect the patient's date of admission, before crossing out this date and writing June 4, 2020, the date

of the form's completion. (Doc. 38 ¶¶ 154-55; see Doc. 38-8.) According to Relator, the government paid for the care provided in each case because the government does not review the individual nursing assessment forms; instead, the government relies on Defendants' representation that a timely nursing assessment was conducted.[1] (Doc. 38 ¶¶ 152, 156.)

And finally, Relator alleges that Old Vineyard did not maintain appropriate documentation in the outpatient unit. According to Relator, Defendants billed the government for group therapy meetings despite not maintaining the required progress notes for these meetings. (Id. ¶¶ 171-75.) She further alleges that Defendants filed claims for patient admission despite possessing incomplete admissions orders signed by unauthorized personnel. (Id. ¶¶ 179-80; see Docs. 38-11, 38-12.)

**B. Procedural Background**

On May 11, 2023, Relator filed her two-count complaint under seal, alleging violations of the FCA, specifically 31 U.S.C. § 3729(a)(1)(A), and the NCFCA. (Doc. 1.) After extensive briefing and multiple extensions of time, the United States and the State of North Carolina filed notice of their decision not to

[1] Relator further alleges that Defendants backdated an Admission Medication Reconciliation and Physician Order Form for May 11, 2020, because the nursing supervisor who signed the form was not present on May 11, 2020. (Doc. 38 ¶ 161; see Doc. 38-10.)

intervene in the action on January 17, 2025. (Doc. 20.) The court thus unsealed the case five days later. (Doc. 21.)

Relator served Defendants, and Defendants moved to dismiss the case for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 34.) Thereafter, Relator successfully moved to amend her complaint. (Docs. 37, 44.) Defendants then filed a second motion to dismiss pursuant to Rule 12(b)(6). (Doc. 45.) This motion is now fully briefed and ready for decision.

## II. ANALYSIS

### A. Standard of Review

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A Rule 12(b)(6) motion to dismiss is meant to "test[] the sufficiency of a complaint" and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

In considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint,"

Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the non-moving party's favor, Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). But the court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000). Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegations "to raise a right to relief above the speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible." Twombly, 550 U.S. at 555, 570; see also Iqbal, 556 U.S. at 678. Thus, mere legal conclusions should not be accepted as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

In addition to this plausibility standard, fraud claims brought under the FCA "must be pleaded with particularity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure."[2] United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc., 707 F.3d 451, 455 (4th Cir. 2013). "Rule 9(b) requires a plaintiff alleging fraud or mistake, like a False Claims Act [whistleblower], to 'state with particularity the circumstances constituting fraud or

[2] "The NCFCA largely parallels the [FCA] and is interpreted consistent with it." United States ex rel. Gugenheim v. Meridian Senior Living, LLC, 36 F.4th 173, 179 n.2 (4th Cir. 2022) (citing N.C. Gen. Stat. § 1-616(c)). Thus, the court's analysis for Relator's claim brought pursuant to the FCA mirrors its analysis for the NCFCA claim. See id.

mistake,' though knowledge 'may be alleged generally.'" United States ex rel. Wheeler v. Acadia Healthcare Co., 127 F.4th 472, 485 (4th Cir. 2025) (alteration in original) (quoting United States ex rel. Taylor v. Boyko, 39 F.4th 177, 189 (4th Cir. 2022)). "These circumstances are often 'referred to as the "who, what, when, where, and how" of the alleged fraud.'" Id. (quoting Taylor, 39 F.4th at 189).

Here, Relator brings "a presentment claim pursuant to 31 U.S.C. § 3729(a)(1)(A), which provides that 'any person who [. . .] knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval [. . .] is liable to the United States Government.'" Id. at 486 (alterations in original). To survive a motion to dismiss, Relator must sufficiently allege four elements:

> 1) that [the defendant] made a false statement or engaged in a fraudulent course of conduct; 2) such statement or conduct was made or carried out with the requisite scienter; 3) the statement or conduct was material; and 4) the statement of conduct "caused the government to pay out money or to forfeit moneys due (i.e., that involved a 'claim')."

Id. at 487 (footnote omitted). (quoting Taylor, 39 F.4th at 188). "Failure to adequately allege any of these elements dooms a claim." Taylor, 39 F.4th at 188. Nevertheless, "[a] court should hesitate to dismiss a complaint . . . if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2)

that plaintiff has substantial prediscovery evidence of those facts." United States ex rel. Nicholson v. MedCom Carolinas, Inc., 42 F.4th 185, 195 (4th Cir. 2022) (alteration in original) (quoting Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784, 789 (4th Cir. 1999)).

On a motion to dismiss, a court may "consider documents that are explicitly incorporated into the complaint by reference, and those attached to the complaint as exhibits." Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016) (citation omitted). Moreover, a court "may consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." Id. A court may also "properly take judicial notice of matters of public record" in deciding a Rule 12(b)(6) motion. Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

### B. Whether Relator Has Sufficiently Alleged UHSI's Involvement

Defendants argue that UHSI should be dismissed from this action because the complaint fails to connect it to any of the alleged fraudulent actions. (Doc. 46 at 16.) According to Defendants, Relator's allegations of general corporate overlap do not sufficiently plead that UHSI controlled or directed a fraudulent scheme. (Id. at 17.) Defendants further contend that

Relator fails to identify any UHSI policy or procedure dictating the alleged fraud, and that her claims regarding general corporate information, purported UHSI employees, past FCA investigations of UHSI, and UHSI's alleged corporate integrity agreement with the United States Department of Health and Human Services ("HHS") "are substantively irrelevant." (Id. at 18-19.)

Relator counters that UHSI controls Medicare and Medicaid compliance at Old Vineyard. (Doc. 52 at 23.) She highlights a printout from UHSI's website indicating the company has 99,300 employees (id. at 23), as well as correspondence between herself and a UHSI human resources employee from Pennsylvania regarding her initial concerns over fraudulent billing (id. at 24). Moreover, she asserts that UHSI's public filings indicate that the company controls the operations of its subsidiaries while receiving income from Medicare and Medicaid, and its policy manuals outline the expectation that its subsidiaries will comply with laws and regulations. (Id. at 25-27.) Finally, Relator points to UHSI's past status as an FCA defendant and the 2020 corporate integrity agreement between UHSI and HHS, which required monitoring of UHSI's Medicare, Medicaid, and Tricare claims. (Id. at 27-28 (citing Universal Health Servs., Inc. v. United States ex rel. Escobar, 579 U.S. 176 (2016)).)

"Under Rule 9(b) an FCA Relator must identify, with particularity, 'each individual's culpable conduct; defendants

cannot be grouped together without specification of which defendant committed which wrong.'" United States ex rel. Kyer v. Thomas Health Sys., Inc., 756 F. Supp. 3d 75, 86 (S.D. W. Va. 2024) (quoting United States ex rel. Ahumada v. NISH, 756 F.3d 268, 281 n.9 (4th Cir. 2014)). "[T]he relator must show that the parent company 'is liable under a veil piercing or alter ego theory, or that it is directly liable for its own role in the submission of false claims.'" United States ex rel. Lisitza v. Par Pharm. Cos., No. 06 C 06131, 2013 WL 870623, at *5 n.6 (N.D. Ill. Mar. 7, 2013) (quoting United States ex rel. Hockett v. Columbia/HCA Healthcare Corp., 498 F. Supp. 2d 25, 60 (D.D.C. 2007)). "Allegations of general corporate overlap are not enough to support that one entity controlled another to participate in a fraudulent scheme." United States ex rel. Miller v. Reckitt Benckiser Grp. PLC, 698 F. Supp. 3d 889, 909 (W.D. Va. 2023).

Here, the amended complaint contains conclusory allegations as to the corporate relationship between UHSI and Old Vineyard, and it provides facts consistent with UHSI's ability to control the operations of its subsidiaries. For example, it alleges that UHSI "owns Old Vineyard and dictates control over its policies and procedures." (Doc. 38 ¶ 15.) It further alleges that Defendants "operate Old Vineyard together in concert and both have ratified each other's actions." (Id. ¶ 16.) Moreover, Relator alleges that a UHSI human resources employee in Pennsylvania investigated

her claims when she reported her concerns regarding the alleged fraud to the management at Old Vineyard.[3] (Id. ¶ 15; see Doc. 38-2.) The complaint also once refers to Old Vineyard physicians as "UHS medical staff" (Doc. 38 ¶ 65), and it alleges that Clinical Director Stout informed Relator that UHSI "pressured clinical directors and utilization review managers to keep patients with more authorized days of treatment to remain, and to discharge anyone whose insurance had run out." (Id. ¶ 133). These largely conclusory allegations, however, fail to sufficiently connect UHSI to the alleged fraudulent billing practices Relator says she observed at Old Vineyard. Though the complaint also repeatedly attributes fraudulent actions to "Defendants" generally, collective references to "Defendants" do not identify the participation of UHSI in the purported fraud. See Miller, 698 F. Supp. 3d at 909-10; Kyer, 756 F. Supp. 3d at 85 (dismissing a qui tam complaint that repeatedly referenced "Defendants" because the "voluminous pleading ha[d] an identity problem").

Beyond the complaint, Relator points to UHSI's 2025 Form 10-K and its corporate policies to demonstrate that UHSI derives a substantial portion of its income from Medicare and Medicaid and that UHSI sets the compliance policy for its subsidiaries. (Doc.

---

[3] The parties dispute whether this HR employee was an employee of UHSI or one of its subsidiaries. (Doc. 52 at 24; Doc. 54 at 5-6.) In any event, the employee's email responding to Relator's claims is insufficient to demonstrate UHSI controlled or directed the alleged violations.

52 at 25-27.) She also highlights UHSI's status as "a recidivist qui tam defendant" and its previous entry into a corporate integrity agreement with HHS. (Id. at 27.) To be sure, these facts demonstrate that UHSI can dictate and, ultimately, be held liable for the false claim submissions of its subsidiaries as a general matter. But Relator fails to sufficiently allege that UHSI has dictated the actions at issue here. Mere "[a]llegations of general corporate overlap are not enough to support that" UHSI controlled the alleged fraudulent acts carried out by Old Vineyard in this case. See Miller, 698 F. Supp. 3d at 909; see also Wheeler, 127 F.4th at 488 ("A mere allegation that a corporate policy exists, with nothing more, is insufficient."). Defendants' motion to dismiss Relator's claims against UHSI will therefore be granted, though the dismissal will be without prejudice in the event Relator can cure the deficiency.

### C. Whether Relator Has Sufficiently Alleged the Elements of an FCA Claim

#### 1. Falsity

Defendants contend that Relator has failed to allege an objective falsehood. (Doc. 46 at 27.) They point to the amended complaint's failure to distinguish between Old Vineyard and UHSI, and they argue that she has failed to cite a single statute, regulation, or other guidance that Defendants allegedly violated in submitting its CPT codes. (Id. at 28-29.) Moreover, Defendants

argue that her allegations of pre-signing and backdating rely on suppositions and assumptions, and they assert that the amended complaint fails to allege any false claim related to pressure to keep patients longer than medically necessary. (Id. at 30-32.) Finally, they contend that belated nursing assessments, missing documentation, and miscellaneous emails cannot form the basis of false claim allegations. (Id. at 33-35.)

Relator counters that she need not possess first-hand knowledge of all false statements to survive a motion to dismiss, and she argues that her allegations extend well beyond "mere imprecision, poor management, or differing interpretations of a legal question." (Doc. 52 at 31.) She emphasizes her first-hand observations of the alleged fraudulent billing practices. (Id. at 32.) Further, she contends that the conveyance of false information through CPT codes satisfies the FCA, because such codes form an integral component of the government's claims process. (Id. at 33.)

In the FCA context, "Congress did not define what makes a claim 'false' or 'fraudulent.'" Taylor, 39 F.4th at 200 (quoting Escobar, 579 U.S. at 187). The Fourth Circuit thus applies the common-law meaning of "false or fraudulent," which encompasses "any 'words or conduct' that 'amount[] to an assertion not in accordance with the truth.'" Id. (alteration in original) (quoting Restatement (Second) of Torts § 525 cmt. b (A.L.I. 1977)). The

common-law meaning also includes a "representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying [information]." Id. (alteration in original) (quoting Restatement (Second) of Torts, supra, § 529).

**a. Failure to Distinguish Defendants**

Defendants argue that all of Relator's claims should be dismissed because the amended complaint fails to distinguish between Defendants. (Doc. 46 at 28.) To be sure, "[a] complaint fails to meet the particularity requirements of Rule 9(b) when a plaintiff asserts merely conclusory allegations of fraud against multiple defendants without identifying each individual defendant's participation in the alleged fraud." United States ex rel. Sheldon v. Forest Lab'ys, LLC, 754 F. Supp. 3d 615, 640 (D. Md. 2024) (citation modified) (quoting Kimberlin v. Hunton & Williams LLP, GJH-15-723, 2016 WL 1270982, at *7 (D. Md. Mar. 29, 2016)), rev'd on other grounds sub nom., United States ex rel. Sheldon v. Allergan Sales, LLC, 170 F.4th 227 (4th Cir. 2026)).

But here, while the complaint repeatedly refers to "Defendants" collectively, the allegations in context clearly connect Old Vineyard to the fraudulent activities described. Relator pleads detailed allegations involving specific physicians and administrators who worked at Old Vineyard. (See, e.g., Doc. 38 ¶¶ 67, 91-92, 108-09, 117-18.) Moreover, she bases her

allegations on her personal observations as an employee at Old Vineyard for four-and-a-half years. (Id. ¶¶ 13, 17.) Thus, drawing every inference in Relator's favor, she has sufficiently alleged more than "conclusory allegations" of Old Vineyard's direct participation in the described fraudulent billing activities, and the motion to dismiss on this basis will be denied.

**b. Billing for Services Not Rendered**

Defendants argue that Relator has failed to cite to any "statute, regulation, or even sub-regulatory guidance" they would have violated by the alleged failure to comply with CPT Code requirements. (Doc. 46 at 28-29.) In response, Relator cites the Centers for Medicare & Medicaid Services ("CMS") Medicare Claims Processing Manual in addition to 45 C.F.R. § 162.1002. (Doc. 52 at 33.)

The Code of Federal Regulations expressly lists CPT Codes among its requirements for covered entities when submitting information on covered transactions to HHS. See Medical Data Code Sets, 45 C.F.R. § 162.1002(a)(5), (c)(1) (2025). Moreover, "[f]actually false claims [under the FCA] generally require a showing that the payee has submitted an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." United States ex rel. Polukoff v. St. Mark's Hosp., 895 F.3d 730, 741 (10th Cir. 2018) (quoting United States ex rel. Thomas v. Black & Veatch Special Projects

Corp., 820 F.3d 1162, 1168 (10th Cir. 2016)).

Here, at bottom, the amended complaint alleges that Old Vineyard submitted billing claims with specific CPT Codes that misrepresented the services provided to Old Vineyard's patients. The amended complaint and its attached exhibits provide eight examples from Relator's own observations where Old Vineyard billed under CPT codes representing evaluations between 16 to 60 minutes even though the actual evaluations lasted, at most, eight minutes. (Doc. 38 ¶ 67; see Doc. 38-4.) Though Defendants contend that Relator fails to allege a single, concrete example of false CPT codes submitted or claims paid as a result (Doc. 54 at 10), the amended complaint in fact does allege that the eight examples were sent to the government and that the government paid each claim (Doc. 38 ¶¶ 70-71). These examples create more than an inference of "shoddy record keeping." Cf. United States ex rel. Phillips v. Pediatric Servs. of Am., Inc., 142 F. Supp. 2d 717, 731-32 (W.D.N.C. 2001) (finding at the summary judgment stage that the evidence indicated nothing more than "the type of mistakes commonly encountered in the course of business"). Thus, Relator has sufficiently alleged that Old Vineyard misrepresented the services provided in its requests for reimbursement based on its use of CPT Codes. See Wheeler, 127 F.4th at 487-88 (holding that the complaint satisfied the FCA's falsity element where it contained "detailed allegations that [the defendant] create[d] notes for

therapy sessions that did not actually occur," which "would constitute misrepresentations about the services [it] provided under government healthcare programs"); cf. Phillips, 142 F. Supp. 2d at 728 (granting the defendant summary judgment on the relator's FCA claim in part because the relator "placed before the Court no admissible evidence of the actual Medicare requirements, rules or regulations").

### c. Backdated, Batch-Dated, and Pre-Signed Medicare Certifications

Defendants argue that the mere fact that a non-physician may have added information or dates to a form after a physician signed the form does not indicate falsity. (Doc. 46 at 31.) They also cite cases where the court found that allegations of backdating do not sufficiently demonstrate falsity at the pleading stage (id.), though Relator points out that one case dealt with a different regulation (Doc. 52 at 32).

The amended complaint cites 42 C.F.R. § 424.14, which provides in relevant part that a physician's certification of the medical necessity of inpatient psychiatric services "is required at the time of admission or as soon thereafter as is reasonable and practicable, and must be completed and documented in the medical record prior to discharge." See Requirements for Inpatient Services of Inpatient Psychiatric Facilities, 42 C.F.R. § 424.14(d) (2025). A physician must also recertify at the

appropriate interval that the inpatient services continue to be required. Id. § 424.14(c).

Though Defendants cite cases dismissing FCA claims based on either the pre-preparation or backdating of forms, these cases ultimately prove inapt. First, in Phillips, the court dismissed the claims based on pre-preparation of forms at the summary judgment stage in part because no "regulation ha[d] been placed in the record" that pre-preparation of forms "was against Medicare regulations." Phillips, 142 F. Supp. 2d at 732. The court further explained that the relator "ha[d] not shown by direct evidence that the information supplied on the . . . forms when they were pre-prepared . . . was false." Id. Second, in United States ex rel. Johnson v. E-Med Source of Fla., Inc., No. 13-cv-02017, 2015 WL 6742059, at *3 (M.D. Fla. Nov. 3, 2015), the court found, while addressing a different regulation, that backdating plans of care in and of itself was not clearly a violation of Medicare rules. And third, in United States ex rel. Napoli v. Premier Hospitalists PL, No. 14-cv-2952, 2016 WL 5476199, at *5 (M.D. Fla. Sept. 29, 2016), the court dismissed the relator's FCA claims after finding that the untimely entry of progress notes did "not show that doctors actually backdated or otherwise falsified their notes."

Here, the amended complaint alleges that physicians at Old Vineyard either pre-signed certification forms before patient admission, recertified the continued medical necessity of

treatment weeks before the recertification date, or completed and backdated the certification forms one week or more after a patient's admission. (Doc. 38 ¶¶ 92, 100, 108-09, 120.) According to Relator, these practices facilitated the completion of the certification forms by non-physicians on the dates required by Medicare, without a concurrent determination by a physician of the medical necessity of treatment. (Id. ¶¶ 92, 99, 110, 120-21.) Unlike the pre-preparation of forms at issue in Phillips, Relator has cited a regulation mandating that the relevant certification forms be completed on a specific timeline by specific personnel. Indeed, it is not just the backdating or pre-signing of the forms that provides the basis for the alleged falsity; rather, it is the fact that certification of medical necessity occurred without timely input from a physician. These allegations, taken as true, thus sufficiently demonstrate that the signing practices described in the amended complaint violate Medicare requirements that physicians timely certify the medical necessity of treatment and then recertify the continued medical necessity of treatment as necessary. 42 C.F.R. § 424.14.

**d. Improper and Excessive Stays**

Defendants argue that Relator's allegations of pressure to keep patients longer than medically necessary to receive further government payment fail "to identify a single, specific instance where a particular patient was actually kept for a specific amount

of time longer than was deemed medically necessary by a specific doctor." (Doc. 46 at 32.) Relator's response in opposition does not directly address this argument.

Defendants are correct as to the deficiencies of the allegations regarding improper and excessive stays. In one telling paragraph, Relator alleges, "The doctors and staff faced pressure not to discharge patients when the patient was authorized for more days, and assuming this pressure was successful, patients' stays were impermissibly extended beyond what was medically necessary." (Doc. 38 ¶ 132 (emphasis added).) Relator does not ever allege that a patient was in fact kept longer than medically necessary because of pressure from leadership, let alone provide a specific, concrete example of this practice. Accordingly, the motion to dismiss Relator's claims to the extent they are based on pressure to improperly extend patient stays will be granted.

**e. Improper Nursing Assessments**

Defendants contend that Relator's claims based on improper nursing assessments should be dismissed because she has not cited any statute, regulation, or rule requiring that nursing assessments be conducted within 24 hours of admission. (Doc. 46 at 33.) Relator does not directly respond to this argument. And in fact, though Relator alleges fraud based on Defendants' failure to complete the assessments within 24 hours (Doc. 38 ¶ 157), she does not allege any law or regulation requiring such a timeline.

Accordingly, Relator's claims based on untimely assessments will be dismissed. See United States ex rel. Donohue v. Carranza, No. 20-cv-05396, 2023 WL 2414166, at *8 (S.D.N.Y. Jan. 14, 2023) (finding that the relator failed to plausibly allege a legally false claim because he did not "identify any law or regulation" that the defendants violated by billing for the services at issue), report and recommendation adopted, 2023 WL 2263119 (S.D.N.Y. Feb. 28, 2023), aff'd sub nom., United States ex rel. Donohue v. Buffalo Pub. Sch. Dist., 2024 WL 1827268 (2d Cir. Apr. 26, 2024).

However, the relevant claims are not just based on untimely nursing assessments. Relator also alleges that Defendants sometimes would not conduct nursing assessments at all but still submit reimbursement claims to the government. (Doc. 46 ¶ 144.) She then provides an example of an assessment form, which includes the patient's name but otherwise appears blank. (Id. ¶¶ 146-49; see Doc. 46-7.) Relator further alleges that Defendants billed the government for this never-performed nursing assessment. (Doc. 46 ¶ 150.) Accordingly, Relator has sufficiently alleged factual fraud as to the assessments never conducted yet submitted for reimbursement. Cf. Donohue, 2023 WL 2414166, at *8 (dismissing the relator's claims based on factual falsity because he did "not allege that the [defendants] requested reimbursement for goods or services that were never provided").

**f. Missing Documentation in the Outpatient Unit and Missing Admission Orders**

Defendants argue that the court should dismiss Relator's claims to the extent they are based on alleged missing documentation in the outpatient unit or missing admission orders because she has not provided "any requirement for Defendants to certify" the existence of proper documentation of such treatment "before submitting [the claims] for payment." (Doc. 46 at 34 (citing United States ex rel. McGinnis v. OSF Healthcare Sys., No. 11-cv-01392, 2014 WL 2960344, at *7 (C.D. Ill. July 1, 2014)).) Relator again does not directly respond to this argument.

Here, Relator alleges in effect that Defendants failed to properly document treatment at the outpatient unit and failed to maintain records of admission orders. (Doc. 38 ¶¶ 168-84.) To be sure, these paragraphs do not allege that Defendants billed the government for treatment or admissions that never occurred. Rather, the theory seems to be that, by billing for services provided, Defendants falsely certified that the claims were properly documented. But Relator does not allege any requirement that Defendants certify the existence of proper documentation when billing the government for services performed. "These sorts of false claims theories – premised upon implicit certification without a citation to a duty to certify or affirmatively state compliance with an applicable rule or regulation – have been

squarely rejected by several Courts of Appeals." McGinnis, 2014 WL 2960344, at *7 (first citing United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc., 214 F.3d 1372, 1376 (D.C. Cir. 2000); and then citing United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1266 (9th Cir. 1996)). Relator therefore fails to allege either a legal or a factual falsity related to Defendants' alleged poor recordkeeping, and the motion to dismiss Relator's claims based on missing outpatient documentation or admission orders will be granted.

**g. Miscellaneous Emails**

Defendants argue that Relator's "two interesting emails" do not create an FCA claim. (Doc. 46 at 35-36.) Indeed, these emails do not appear intended to set out a claim in and of themselves but rather provide context through alleged discussions of missing documentation or unorganized form signing practices. (Doc. 38 ¶¶ 185-87; see Docs. 38-13, 38-14.) To the extent the alleged emails were intended to constitute their own basis for a claim, the motion to dismiss such a claim will be granted.

**2. Scienter**

Defendants contend that Relator has not alleged specific facts supporting an inference that Defendants knowingly submitted fraudulent claims for payment. (Doc. 46 at 40.) They provide two main reasons. First, Defendants argue that the amended complaint fails to sufficiently plead the individual knowledge of Defendants

beyond "broad, conclusory statements" of their "collective awareness." (Id.) And second, Defendants assert that Relator has failed to plead knowledge of a violation because she never identifies the statute or rule setting forth the requirements that Defendants allegedly violated. (Id. at 41.)

In response, Relator counters that Defendants "are allegedly aware" that the examinations lasted for shorter than the required time and that the group therapy sessions exceeded the maximum number of people. (Doc. 52 at 34.) She further argues that Defendants would have been aware that the remainder of the alleged fraudulent practices demonstrate "greed," "poor medicine," and "poor care." (Id.) Relator points to the corporate integrity agreement as particular evidence of Defendants' awareness "of the need to code properly and to follow Medicare and Medicaid rules," and she highlights the allegation that Defendants trained her on the fraudulent billing procedures. (Id.) Finally, she cites to Escobar, where the Supreme Court explained that scienter can be satisfied notwithstanding a defendant's failure to appreciate the materiality of a condition for payment, even if the Government fails to spell out the condition's materiality. (Id. (citing Escobar, 579 U.S. at 191).)

A defendant meets the FCA's scienter requirement where it "act[s] with actual knowledge, with deliberate ignorance, or with reckless disregard of the truth or the falsity of the information

contained in the claims." Sheldon, 170 F.4th at 241 (citing 31 U.S.C. § 3729(b)(1)(A)). "Actual knowledge refers to information of which a defendant is actually aware." Id. (citing United States ex rel. Schutte v. SuperValu Inc., 598 U.S. 739, 751 (2023)). "Deliberate ignorance 'encompasses defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statements' truth or falsity.'" Id. (quoting Schutte, 598 U.S. at 751). Finally, reckless disregard "captures defendants who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway." Schutte, 598 U.S. at 751. Ultimately, "a party acts with reckless disregard when a claim is submitted carelessly with respect to its truth or falsity." Sheldon, 170 F.4th at 241.

"[T]he scienter standard is a subjective one that focuses on the defendant's thoughts and beliefs." Id. (citing Schutte, 598 U.S. at 749). But even in fraud-based claims like those pursuant to the FCA, "scienter may be alleged generally." Id. at 242 (citing Fed. R. Civ. P. 9(b)). "The FCA does not require scienter to be pled with specificity for good reason . . . [and] [c]ourts must not impose a higher bar for pleading scienter." Id.

**a. Billing for Services not Rendered**

Relator alleges that the Defendants trained her on the billing practices and requirements for group therapy sessions. (Doc. 38

¶ 90.) Nevertheless, "Defendants directed staff to chart that patients were in group when the patient was actually asleep." (Id. ¶ 75.) Further, Relator alleges that Defendants would "bill[] [Medicare] for the entire [group therapy] session regardless of whether the patient attended the full session." (Id. ¶ 75.) These allegations – that Defendants knew the billing requirements, yet instructed employees to violate them anyway – are sufficient to plead that Defendants, at a minimum, were "aware of a substantial risk that their statements are false, but intentionally avoid[ed] taking steps to confirm the statement's truth or falsity." Schutte, 598 U.S. at 751. Therefore, the motion to dismiss these claims based on inadequately pleaded scienter will be denied.

**b. Back-dated, Batch-dated, and Pre-signed forms**

Relator alleges that Defendants' senior leadership instructed Harris to "take [] batches of blank Medicare certifications to the doctor," and that Harris would "pick up the certifications and date them for whatever date was needed for reimbursement[.]" (Doc. 38 ¶ 92.) Further, Relator alleges that she witnessed Harris and Patella backdate Medicare certifications, (Id. ¶ 97) and that Harris filled out forms that Dr. Kohl had pre-signed, despite not being authorized to fill out the forms. (Id. ¶ 121.) Importantly, Relator alleges that Harris "was fired for reporting concerns about Defendants' fraudulent billing practices[,]" (Id. ¶ 95), and her

replacement Patella resigned after expressing her own concerns in an email to senior leadership. (Id. ¶ 96.)

These allegations are sufficient to establish scienter. Relator alleges that Defendants were made aware of potentially fraudulent billing practices by Harris and Patella, even firing Harris for it. (Doc. 38 ¶ 95); see United States ex rel. Elliott v. Frazier Aviation, Inc., 830 F. Supp. 3d 474, 502 (E.D. Va. 2026) (holding relator sufficiently plead scienter when alleging, inter alia, that Defendant disregarded concerns raised by relator). Furthermore, the allegations of back-dating, batch-dating, and pre-signing done by specific individuals are sufficient to create a plausible inference that, at minimum, Defendants were "aware of a substantial risk that their statements are false, but intentionally avoid[ed] taking steps to confirm the statement's truth or falsity." Schutte, 598 U.S. at 751. Therefore, the motion to dismiss these claims based on pleading of scienter will be denied.

**c. Improper Nursing Assessments**

Relator alleges that Defendants would not do nursing assessments but still "fill[] out reimbursement claims that were completely false." By way of example, Relator provides a document demonstrating that a nursing assessment was not performed for an anonymized patient. (Doc. 38-7 at 1; Doc. 38 ¶ 149.) However, Relator alleges that Defendants nevertheless billed the government

for a nursing assessment of the anonymized patient. (Doc 38 ¶¶ 148, 150.)

At bottom, Relator alleges that Defendants filled out documents purporting that a nursing assessment was conducted, while their documentation indicated that no such assessment had occurred. These allegations are sufficient to plead that Defendants were, at a minimum, submitting claims "carelessly with respect to [their] truth or falsity." Sheldon, 170 F.4th at 241. Therefore, Relator has adequately plead scienter for the claims arising out of improper nursing assessments, and the motion to dismiss on this basis will be denied.

**3. Materiality**

Defendants argue that Relator has failed to demonstrate that any alleged falsities were material. They contend that "Relator has not explained why the alleged misrepresentations would be 'so central' to a claim for payment that the 'government would not have paid these claims had it known of these violations.'" (Doc. 46 at 29 (quoting Taylor, 39 F.4th at 190) (alterations adopted).)

Relator counters that "courts have tended to find that falsifying medical records of patients whose care is paid for by the government is sufficient by itself, or nearly sufficient, to state a claim." (Doc. 52 at 37.) Further, Relator asserts that Defendants conducted "a well-orchestrated scheme reaching many levels of care[,]" rather than a mere "failure to pay a $25 fee."

(Id.)

"A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." Escobar, 579 U.S. at 181. "In order to meet the materiality requirement, the fraud alleged under the False Claims Act must be 'so central to' the purpose of the government contract that the government 'would not have paid the claims had it known of the violations.'" Wheeler, 127 F.4th at 489 (quoting Escobar, 579 U.S. at 196) (cleaned up).

The Fourth Circuit discussed three cases in Wheeler that "help establish the framework for determining whether a claim is material." 127 F.4th at 489. In Triple Canopy, the materiality element was met when the relator alleged that a private military security company's guards did not meet the required marksmanship requirements. The court noted that the "Government's decision to pay a contractor for providing base security in an active combat zone would be influenced by knowledge that the guards could not, for lack of a better term, shoot straight." United States v. Triple Canopy, Inc., 857 F.3d 174, 179 (4th Cir. 2017) (quoting United States v. Triple Canopy, Inc., 775 F.3d 628 (4th Cir. 2015), cert. granted, judgment vacated sub nom. Triple Canopy, Inc. v. U.S. ex rel. Badr, 579 U.S. 924 (2016), and opinion reinstated in part, 857 F.3d 174 (4th Cir. 2017)). Likewise, in

Walgreen Company, the government alleged that defendants submitted false reports that patients passed drug tests, along with other false lab reports. The Fourth Circuit stated that "the very act of falsifying records to feign compliance with requirements suggests that Walgreens itself thought that those requirements were material." United States v. Walgreen Co., 78 F.4th 87, 94 (4th Cir. 2023).[4]

On the other hand, in Taylor, the relator alleged that the defendant failed "to maintain its certificate of corporate authorization[,]" which entailed "fil[ing] an annual report and pay[ing] a $25 fee." Wheeler, 127 F.4th at 490 (discussing Taylor, 39 F.4th at 191, 202). Though the relator "adequately alleged that the staffing company violated state law by failing to maintain corporate authorization, there was no reason to infer that the federal government would decline to pay the Medicare claims as a result." Wheeler, 127 F.4th at 490.[5]

[4] The Supreme Court in Escobar provided a similar hypothetical of a defendant that contracted to provide the government with guns that and provided guns that "do not shoot[.]" 579 U.S. at 191. In such a case, "because a reasonable person would realize the imperative of a functioning firearm, a defendant's failure to appreciate the materiality of that condition would amount to 'deliberate ignorance' or 'reckless disregard' of the 'truth or falsity of the information' even if the Government did not spell this out." Id. at 191.

[5] Similarly, in Escobar, the Supreme Court gave a hypothetical where a requirement to buy American-made staplers added to a health services contract would not suffice to show materiality. 579 U.S. at 195; Wheeler, 127 F.4th at 489 (finding that a "failure to follow a 'minor or insubstantial' requirement . . . does not suffice to show materiality" (quoting Escobar, 579 U.S. at 194)).

With this "framework" in mind, the court turns to the instant allegations. Wheeler, 127 F.4th at 489.

### a. Billing for Services not Rendered

The Code of Federal Regulations expressly lists CPT Codes among its requirements for covered entities when submitting information on covered transactions to HHS. See Medical Data Code Sets, 45 C.F.R. § 162.1002(a)(5), (c)(1) (2025). Relator alleges that Old Vineyard submitted billing claims with specific CPT Codes that misrepresented the services provided. (Doc. 38 ¶ 67; see Doc. 38-4.) "Falsifying patient records to government healthcare programs is not akin to failing to purchase American staplers or failing to maintain a certificate of corporate authorization with the state[.]" Wheeler, 127 F.4th at 490 (internal citations omitted); cf. United States ex rel Montcrief v. Peripheral Vascular Assocs., P.A., 133 F.4th 395, 407 (5th Cir. 2025) (upholding jury verdict finding that "had Medicare known it was being billed for incomplete procedures, it would not have paid the relevant claims.").[6]

[6] In this respect, the alleged fraud in this case is analogous to upcoding, "a common form of Medicare fraud, [which] is the practice of billing Medicare for medical services or equipment designated under a code that is more expensive than what a patient . . . was provided." United States ex rel. Bledsoe v. Cmty. Health Sys., Inc., 342 F.3d 634, 638 n.3 (6th Cir. 2003). Here, Relator alleges that Defendants would bill under a code requiring a 20-30 minute therapy session, while only meeting with the patient for "less than 16 minutes, typically 3-8 minutes[.]" (Doc. 38 ¶¶ 66-67.) Courts have found that "upcoding," properly shown, can be material to the government. See, e.g., United States v. Akoto, No. CV 8:25-157-TDC, 2025 WL 1702951, *6 (D. Md. June

Likewise, "the magnitude of the noncompliance weighs in favor of materiality." United States ex rel. Osinek v. Permanente Med. Grp., Inc., 640 F. Supp. 3d 885, 910 (N.D. Cal. 2022). Relator alleges that, at 2021 billing rates, Defendants were improperly billing $7,781.00 a day through CPT code 90832, which would be $2,840,065 a year. (Doc. 38 at ¶ 74.) The sheer dollar amount of allegedly false claims supports the conclusion that the alleged false billing was not merely "minor or insubstantial[.]" Escobar, 579 U.S. at 194; see Osinek, 640 F. Supp. 3d at 910 (holding that materiality was adequately pled when the government alleged that the defendant "reap[ed] thousands of dollars for each inaccurate diagnosis code"); cf. United States ex rel. Rose v. Stephens Inst., 909 F.3d 1012, 1022 (9th Cir. 2018) (reasoning that noncompliance with regulations can be deemed minor or insubstantial when the monetary impact is small, such as if "a school [were] to offer admissions representatives cups of coffee or $10 gift cards for recruiting higher numbers of students").

For these reasons, Relator has adequately alleged materiality for the claims involving billing for services not rendered, and

---

18, 2025), report and recommendation adopted, No. CV 25-0157-TDC, 2025 WL 2453432 (D. Md. July 21, 2025); Ruckh v. Salus Rehab., LLC, 963 F.3d 1089, 1105 (11th Cir. 2020) (upholding jury determination that defendants' upcoding was material); Kane v. Select Med. Corp., No. 8:21-CV-1050-CEH-TGW, 2026 WL 799406, at *8 (M.D. Fla. Mar. 23, 2026) (finding that relator adequately alleged that upcoded false claims were material to the government).

the motion to dismiss on this basis will be denied.

### b. Back-dated, Batch-Dated, and Pre-Signed Medicare Forms

The relevant section of the Code of Federal Regulations provides that "[t]he purpose of the [certification] statements [] is to help ensure that Medicare pays only for services of the type appropriate for Medicare coverage." 42 C.F.R. § 424.14(a) (emphasis added). The regulations also provide specific timing requirements for certification and recertification. 42 C.F.R. § 424.14(d)(1-2). The regulations themselves therefore lead to the "common sense" conclusion, Triple Canopy, 857 F.3d at 178, that, to ensure that "Medicare pays only for services of the type appropriate for Medicare coverage[,]" the government would not pay for services that were not certified and recertified at the proper times. 42 C.F.R. § 424.14(a). As a result, Relator has sufficiently pleaded materiality as to the alleged back-dating, batch-dating, and pre-signing of forms, and the motion to dismiss on this basis will be denied.

### c. Improper Nursing Assessments

As discussed above, Relator has alleged that the Defendants would not conduct nursing assessments but still submit reimbursement claims (for those nonexistent nursing assessments) to the government. (Doc. 46 ¶ 144.) As Relator contends, "[t]here is no serious question that the Government would not have paid for services that were never provided at all." United States ex rel.

Jones v. Concerted Care Grp., No. CV RDB-16-3056, 2022 WL 861396, at *10 (D. Md. Mar. 23, 2022); see also United States v. Centra Health, Inc., 724 F. Supp. 3d 549, 568 (W.D. Va. 2024) ("'[c]ommon sense tells us' that the government would not have paid for services that were never provided." (alteration in original) (quoting Bokyo, 39 F.4th at 193)). Accordingly, the motion to dismiss on the ground that Relator has not sufficiently alleged materiality as to the assessments never conducted yet submitted for reimbursement will be denied.

**4. Presentment or Submission**

Defendants argue that Relator has failed to plead presentment because she "provides no information regarding who submitted [the] forms, where they were submitted, and what the process was for submitting them." (Doc. 46 at 15.) Further, they contend that "there is no reliable indication that allegedly false CPT codes for any particular patient were used to bill a government healthcare program." (Doc. 54 at 10.) Finally, they assert that Relator failed to "identify a single specific patient as a federal healthcare beneficiary." (Id. at 11.)

Relator counters that the complaint creates a "reasonable inference" that Defendants submitted false claims to the government. (Doc. 52 at 39.) She argues that Defendants would not have "[gone through] all this trouble to backdate, forge, etc. if it did not somehow aid them in the claims process[.]" (Id.)

Finally, she asserts that documentary evidence or first-hand observations of billing records are unnecessary; rather, what is required is "information that naturally tends to translate to false billing records." (Id. (citing Wheeler, 127 F.4th at 494).)

"A plaintiff can establish submission of a false claim in one of two ways." Wheeler, 127 F.4th at 491. First, a plaintiff can "allege with particularity that specific false claims actually were presented to the government for payment." Nathan, 707 F.3d at 457. "Alternatively, a plaintiff can allege that the defendant's fraudulent conduct necessarily led to the plausible inference that false claims were submitted to the government." Wheeler, 127 F.4th at 491. It is not enough for the plaintiff to allege that the defendants' actions "could have led, but need not necessarily have led, to the submission of false claims." Nathan, 707 F.3d at 457 (emphasis in original). However, if the relator can "alleg[e] particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted[,]" United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009), the relator's complaint may survive a motion to dismiss. See Wheeler, 127 F.4th at 493.

**a. Billing for Services not Rendered**

Beginning with the first option for presentment, Relator has not "allege[d] with particularity that specific false claims

actually were presented to the government for payment." Nathan, 707 F.3d at 457. This requires the relator to, "at a minimum, describe 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" Id. at 455-456 (quoting United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 379 (4th Cir. 2008). Relator has failed to describe the time and place of the false representations, along with "the identity of the person making the misrepresentation[.]" Wilson, 525 F.3d at 379; (see Doc. 38 ¶¶ 82-86 (stating that forms were sent "to the billing office" who would "generate" forms).)

However, Relator has sufficiently established the second option for presentment, that Defendants' conduct "necessarily led to the plausible inference that false claims were submitted to the government." Wheeler, 127 F.4th at 491. Relator has alleged that "Defendants directed staff to chart that patients were in group when the patient was actually asleep." (Doc. 38 ¶ 75.) As a neighboring court found, "it would stretch the imagination" to think that the false group therapy attendance records were created "for a reason other than submitting such documentation to [the government] to substantiate billing for the hours of services falsely described by those documents." United States ex rel. Virginia v. Century Park Cap. Partners, LLC, No. 7:21-CV-420, 2025 WL 1959356, at *18 (W.D. Va. July 16, 2025) (citing Wheeler, 127

F.4th at 493).

The same analysis applies to Relator's allegations that Defendants billed under CPT codes that misrepresented the services rendered. (See Doc. 38 ¶ 67; Doc. 38-4.) It is more than plausible that Defendants billed under specific CPT codes to seek payment and did not "deviate from the regular billing track at the last moment so that the recorded, but unprovided, services never get billed." Wheeler, 127 F.4th at 493.

Therefore, the motion to dismiss for failure to adequately plead presentment for these claims will be denied.

**b. Back-dating, batch-dating, and pre-signing forms**

Beginning again with the first avenue for presentment, Relator has not "allege[d] with particularity that specific false claims actually were presented to the government for payment." Nathan, 707 F.3d at 457. While Relator details the scheme to back-date, batch-date, and pre-sign forms, she does not allege "the time, place, and contents" of presentment to the government, or "the identity of the person making the misrepresentation" to the government. Wilson, 525 F.3d at 379; (see Doc. 38 ¶ 101 (stating that "[t]he Defendants presented these backdated forms to the government").)

Nevertheless, Relator adequately pleads presentment under the second avenue as to the allegations of back-dated, batch-dated,

and pre-signed forms. Relator alleges that Defendants' senior leadership instructed Harris to "take [] batches of blank Medicare certifications to the doctor," and that Harris would "pick up the certifications and date them for whatever date was needed for reimbursement[.]" (Doc. 38 ¶ 92.) Further, Relator alleges she witnessed Harris and Patella backdate Medicare certifications. (Id. ¶ 97.) Finally, Relator alleges that Harris filled out forms that Dr. Kohl had pre-signed, despite not being authorized to fill out the forms. (Id. ¶ 121.)

Here, too, it is at least plausible that Harris and Patella had forms pre-signed, back-dated, and batch-dated for no reason "other than submitting such documentation" to the government. Century Park, 2025 WL 1959356, at *18. Therefore, Relator has adequately pleaded presentment of the back-dated, batch-dated, and pre-signed forms, and the motion to dismiss on this basis will be denied.

**c. Improper Nursing Assessments**

Turning to the nursing assessments that were not performed, Relator has not "allege[d] with particularity that specific false claims actually were presented to the government for payment." Nathan, 707 F.3d at 457. While Relator alleges a scheme where nursing assessments were not performed, she does not allege the "the time, place, and contents" of presentment to the government, nor "the identity of the person making the misrepresentation" to

the government. Wilson, 525 F.3d at 379; (see Doc. 38 ¶ 158 (alleging that "Defendants presented [anonymized patient's] care for payment to the government[,]" despite not having performed a nursing assessment).)

Further, Defendants are correct that Relator has not adequately "connect[ed] the dots" under the second avenue between the failure to perform a nursing assessment and government payment. Grant, 912 F.3d at 199. Relator alleges that a nursing assessment of an anonymized patient did not occur on a particular date. (Doc. 38 ¶ 145.) In support, she provides a blank nursing assessment form for an anonymized patient. (Doc. 38-7.) However, these allegations and the accompanying exhibit are insufficient to "connect the dots" by providing "reliable indicia that lead to a strong inference that claims were actually submitted." Grubbs, 565 F.3d at 190 (emphasis added); (see Doc. 38 ¶ 150 (stating that "Defendants billed the government for [anonymized patient's] services improperly").) "[A]n FCA plaintiff may not merely describe a private scheme and then 'allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government.'" Grant, 912 F.3d at 199 (quoting Nathan, 707 F.3d at 457); (see Doc. 38 ¶ 150 (stating that "Defendants billed the government for [anonymized patient's] services improperly").)

Though Relator relies on Wheeler, a critical difference is that in Wheeler and its progeny, the relators had alleged that some document had been created. In Wheeler, the defendants had filled out false therapy notes, allegedly "creat[ing] and sign[ing] the notes[.]" 127 F.4th at 493. Similarly, in Century Park, false therapy notes "were created for sessions that never occurred[.]" 2025 WL 1959356 at *18 (emphasis added). Since the documents had been created, it would "stretch the imagination" to believe that the defendants created the document and then did not submit it to the government. See Wheeler, 127 F.4th at 493 ("There can be little doubt that, if [Defendants] created these false notes, [they] billed for those services.") (emphasis added); Century Park, 2025 WL 1959356, at *18.

Here, in contrast, the allegation is that nursing assessments had not been created, yet nevertheless were presented to the government for payment. (Doc. 38 ¶ 145; Doc. 38-7 (blank form).) While the blank nursing assessment certainly exists, Defendants did not fill out the form with false information (or any information at all), unlike in Wheeler and Century Park. See 127 F.4th at 493; 2025 WL 1959356, at *18. In sum, there is no document here that would allow the court to conclude that Defendants must have submitted the document to the government, on account of them creating the document. See Wheeler, 127 F.4th at 193; Century

Park, 2025 WL 1959356, at *18.[7]

Therefore, the motion to dismiss Relator's claims related to nursing assessments that were not performed will be granted and those claims will be dismissed.

**D. Whether Limitations of Liability Are Appropriate**

Defendants argue that the scope of the lawsuit should be "constrain[ed]" to the following: (1) no claims outside of the time period of January 2016 to June 2020, the time of Relator's employment as an Outpatient Manager at Old Vineyard; (2) only claims for Medicare payment, as opposed to Medicaid and Tricare claims; and (3) only claims for partial hospitalization program ("PHP") outpatient treatment, as opposed to intensive outpatient program ("IOP") outpatient treatment and inpatient treatment. (Doc. 46 at 33-36.) Defendants contend that these limitations are warranted because Relator does not plead sufficient knowledge of IOP outpatient and inpatient practices or of practices outside her employment period. (Id. at 33-36.) Likewise, they contend that prior to January 1, 2024, "the Medicare program did not cover IOP services." (Id. at 35) (emphasis removed) (citing 88 Fed. Reg 81540, 81809 (Nov. 22, 2023).)

Relator counters that "[t]here is no basis at this juncture

[7] For example, if Defendants had filled out the nursing assessment form but had not actually conducted a nursing assessment. Here, the nursing form is blank. (See Doc. 38-7.)

to limit this case" because "[t]he conduct at issue permeated the facility as a whole[.]" (Doc. 52 at 40).

A party "alleging fraud . . . must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The Fourth Circuit's "standard for False Claims Act pleadings require[] that [relators] have 'substantial prediscovery evidence of the facts.'" Wheeler, 127 F.4th at 488 (quoting Harrison, 176 F.3d at 784 (cleaned up)). Therefore, a relator's allegations must meet the pleading requirements for each alleged false claim. See Wheeler, 127 F.4th at 488 (concluding that Relator failed to meet pleading standard for claims for which she did not have personal knowledge).

With these standards in mind, the court will address Defendants' proposed limitations on liability in turn.

**1. Whether Relator Can Recover for Claims Outside of her Employment Period**

Defendant contends that liability should be limited to the time Relator was employed by Old Vineyard because "Relator does not have – and has not otherwise alleged – any basis of knowledge to support her claims." (Doc. 46 at 33.) Relator does not directly respond to this argument, instead asserting that the relevant "programs were in place up until the time Relator's employment ceased, without any indication that the issues identified were addressed other than during the CIA period." (Doc. 52 at 40.)

Relator does not explain in her complaint how she would know about false claims outside her employment period. She argues that "all indications . . . [are] that billing and compliance is a national issue" for Defendants that "permeated the facility as a whole[.]" (Doc. 52 at 40-41). However, "[a] mere allegation that a corporate policy exists, with nothing more, is insufficient" to satisfy Rule 9(b). Wheeler, 127 F.4th at 488; see also United States of Am. ex rel. Andrea Binns v. Spartanburg Reg'l Health Servs. Dist., Inc. et al., No. 7:22-CV-04355-JDA, 2026 WL 2224744 (D.S.C. July 31, 2026) (holding relator could not recover damages for claims made after her termination). Relator's complaint does not "allow [the court] to infer that the alleged [national issue] in fact exists." Wheeler, 127 F.4th at 488. Therefore, the court will grant Defendants' motion to dismiss to the extent that Relator may only recover for claims that occurred at Old Vineyard between January 2016 and June 2020, the period Relator was employed.

**2. Whether Relator Can Recover for Alleged False Medicaid Claims or Tricare Claims**

Defendants contend that liability should be limited to alleged false Medicare claims because Relator "only points to alleged Medicare requirements." (Doc. 46 at 34.) They observe that there are differences in the "purpose, process, and governing standards" of Medicare and Medicaid. (Id. at 34.) Relator does not directly respond to this argument, instead asserting that

"Relator experienced both impatient and outpatient treatment involving Medicare, Medicaid, and [Tricare]." (Doc. 52 at 40.)

"Medicaid is a cooperative federal-state program that provides medical care to needy individuals." Douglas v. Indep. Living Ctr. of S. California, Inc., 565 U.S. 606, 610 (2012). "Medicare and Medicaid cover different services rendered by [federally-qualified health centers], and the two programs reimburse in different manners." E.A. Hawse Health Ctr. v. Bureau of Med. Servs., No. 2:11-CV-00062, 2011 WL 4528492, at *2 (S.D. W. Va. Sept. 28, 2011). "Medicaid is governed by Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq., while Medicare is governed by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq." Evanston Hosp. v. Hauck, No. 92 C 732, 1992 WL 205900, at *2 (N.D. Ill. Aug. 19, 1992), aff'd, 1 F.3d 540 (7th Cir. 1993). "The [Medicaid] Act gives the [s]tates substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage, as long as care and services are provided in 'the best interests of the recipients.'" Alexander v. Choate, 469 U.S. 287, 303 (1985) (quoting 42 U.S.C. § 1396a(a)(19)).

Relator's allegations related to Medicaid are as follows: claims submitted by Defendants to Medicaid "are subjected to an independent review to assess their medical necessity." (Doc. 38 ¶ 23.) Medicaid providers, including Defendants, agree to comply with Medicare regulations, including "providing services that are

economically and medical[ly] necessary[.]" (Id. ¶ 56.) Defendants' doctors saw patients and billed Medicaid, despite "not perform[ing] the tasks required to properly bill" Medicaid. (Id. ¶ 64.) Finally, Relator filled out charge sheets that were necessary to submit claims for Medicaid (id. ¶ 81), but there were often more patients in group therapy sessions that allowed. (Id. ¶ 76.)

As for Tricare, "[Tricare] is a federal healthcare program that covers members of the uniformed military services of the United States." United States v. Premier Med., Inc., No. 6:18-CV-165-TMC, 2023 WL 9060896, at *1, n.2 (D.S.C. Sept. 28, 2023) (citing 10 U.S.C. § 1071 et seq.). Relator's allegations related to Tricare are as follows: claims submitted by Defendant to Tricare are "subjected to an independent review to assess their medical necessity." (Doc. 38 ¶ 23.) Defendants billed Tricare patients "on the inpatient and outpatient services." (Id. ¶ 58.) Finally, Defendants' doctors would bill Tricare for Psychiatric Diagnosis Interview Examinations using the code 90792, but "not perform the tasks required to properly bill this code." (Id. ¶ 64.)

In her complaint, Relator references Medicare requirements and regulations. (See, e.g., Doc. 38 ¶¶ 50, 93.) However, as Defendants point out, she does not reference any Medicaid or Tricare regulations that were allegedly violated by Defendants. As noted above, Medicare, Medicaid, and Tricare "cover different

services rendered by [federally-qualified health centers], and the [] programs reimburse in different manners." E.A. Hawse, 2011 WL 4528492, at *2. Accordingly, Defendants are correct that Relator has failed to "identify any [Medicaid or Tricare] law or regulation" that was allegedly violated by Defendants. Donohue 2023 WL 2414166, at *8. Therefore, Relator has failed to adequately plead false Medicaid or Tricare claims, and her claims will be dismissed to the extent they allege false Medicaid and Tricare claims. See id. (dismissing claim because Relator failed to "identify any law or regulation" that was allegedly violated by Defendants); Foglia v. Renal Ventures Mgmt., LLC, 830 F. Supp. 2d 8, 20 (D.N.J. 2011) (same). However, given the allegations of false Medicare claims that Relator has alleged and because this is subject to cure, the court will dismiss these claims without prejudice. See Misel v. Green Tree Servicing, LLC, 782 F. Supp. 2d 171, 178 (E.D.N.C. 2011) ("Generally, where a defect in the complaint is curable, the court should grant the dismissal without prejudice.").

### 3. Whether Relator Can Recover for Inpatient Treatments and IOP Outpatient Treatments

Defendants contend that Relator "cannot maintain her causes of action based on claims for inpatient or IOP treatment." (Doc. 46 at 35.) First, they assert that Relator "pleads no basis for her knowledge of Defendants' inpatient billing and coding

practices or procedures[.]" (Id. (emphasis omitted).) Second, they argue that Relator "fails to account for the fact that, prior to January 1, 2024, the Medicare program did not cover IOP services." (Id. (emphasis omitted).) Relator does not directly respond to these contentions, instead asserting that "[t]he conduct at issue permeated the facility as a whole[.]" (Doc. 52 at 40.)

As an initial matter, Defendants are correct that Medicare did not pay for IOP services until January 1, 2024. See Medicare Program, 88 Fed. Reg. 81540, 81809-81812 (Nov. 22, 2023). Given the court's conclusion above that Relator can only recover for claims up until June 2020, there is no possibility that any action of the Defendants related to IOP services "caused the government to pay out money or to forfeit moneys due[,]" Taylor, 39 F.4th at 188, during the relevant time period because Medicare was not paying for IOP services during the relevant period. See Medicare Program, 88 Fed. Reg. 81540, 81809-12 (Nov. 22, 2023). Accordingly, Defendants' motion as to Relator's claims will be granted and the claims dismissed to the extent they allege false claims relating to Medicare IOP services.

As for Relator's cause of action based on claims for inpatient treatment, the complaint alleges that Relator "was assigned to assist doctors in inpatient settings on Zoom" during 2020. (Doc. 38 ¶ 18.) She then lists, "by way of example but not

exhaustively[,]" eight instances where Defendants allegedly met with patients for less time than required for the billing codes Defendants used. (Id. ¶ 67.) She attaches an exhibit to her complaint which logs the start and end times of the eight instances. (Doc. 38-4.) The documents in the exhibit have a location for an "Assigned Staff Signature[,]" which is signed by the Relator. (Doc. 38-4; Doc. 38 ¶ 68.) These allegations and the supporting exhibit are sufficient to demonstrate "substantial prediscovery evidence of the facts" relating to alleged improper inpatient billing practices. Harrison, 176 F.3d at 784. Therefore, Defendants' motion to dismiss will be denied to the extent Relator can continue to pursue her claims related to inpatient treatments.

**E. Constitutionality of the FCA's Qui Tam Provisions**

Finally, Defendants argue that the qui tam provisions of the False Claims Act are unconstitutional. (Doc. 46 at 36-46.) Defendant asserts that the qui tam provisions violate the Appointments, Vesting, and Take Care Clauses of Article II of the United States Constitution. (Id. at 36.) The United States has filed a statement of interest defending the constitutionality of these provisions. (Doc. 51.) The court will address the constitutional arguments in turn.

As an initial matter, the United States contends that "the extensive body of evidence that qui tam provisions have, since the

Founding, been understood as established features of American law" resolve any "substantial questions" about the constitutionality of the FCA. (Id. at 12 (emphasis removed).) It is true that early historical practices are highly relevant, though not dispositive, evidence of the Constitution's meaning. The Supreme Court has said that "'[l]ong settled and established practice' may have 'great weight in a proper interpretation of constitutional provisions.'" Chiafalo v. Washington, 591 U.S. 578, 592 (2020) (quoting The Pocket Veto Case, 279 U.S. 655, 689 (1929)). Indeed, "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide [the court's] interpretation of an ambiguous constitutional provision." New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 36 (2022) (quoting NLRB v. Noel Canning, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)). However, the Supreme Court has also cautioned that "to the extent later history contradicts what the text says, the text controls." Id. Accordingly, the court will review the history of qui tam suits to help "guide [the court's] interpretation" of the constitutional questions in this case. Id. (quoting Canning, 573 U.S. at 572 (Scalia, J., concurring in judgment)).

Qui tam suits have a longstanding history in American and English law. Qui tam enforcement statutes have their roots in Roman law, which "relied on a system of prosecution by private

citizens, known as delatores." J. Randy Beck, The False Claims Act and the English Eradication of Qui Tam Legislation, 78 N.C. L. Rev. 539, 566-67 (2000). Qui Tam legislation was adopted in England in the 1300s, allowing for private enforcement of national legislation. See id. at 567-73. The colonies adopted this practice, allowing for informer actions before the Revolution. See, e.g., Act for the Restraining and Punishing of Privateers and Pirates, 1st Assemb., 4th Sess. (N.Y. 1692), reprinted in 1 Laws of the Colony of New York 279, 281 (1894) (permitting informers to sue for, and receive share of, fines imposed on officers who fail to pursue smugglers and pirates). Critically, qui tam enforcement continued after the Founding. "Within the first decade after the Constitution was ratified, Congress enacted approximately ten qui tam provisions authorizing individuals to sue under criminal statutes to help enforce the law." Harold J. Krent, Executive Control over Criminal Law Enforcement: Some Lessons from History, 38 Am. U. L. Rev. 275, 296 (1989); accord Riley v. St. Luke's Episcopal Hosp., 252 F.3d 749, 752 (5th Cir. 2001) (en banc) ("[T]he Founding Fathers and the First Congress enacted a number of statutes authorizing qui tam actions."). "Act[s] 'passed by the first Congress assembled under the Constitution, many of whose members had taken in framing that instrument, . . . is contemporaneous and weighty evidence of its true meaning.'" Marsh

v. Chambers, 463 U.S. 783, 790 (1983) (quoting Wisconsin v. Pelican Ins. Co., 127 U.S. 265, 297 (1888)).

With this backdrop in mind, the court turns to Defendants' arguments.

### 1. Whether the Qui Tam Provisions of the FCA Violate the Appointments Clause

Defendants argue that qui tam relators are "Officer[s] of the United States" that are not "appointed" consistent with the Appointments Clause. (Doc. 46 at 37.) First, they argue that relators are Officers of the United States because of their ability to maintain civil litigation on behalf of the United States. (Id. at 37-38.) Further, they contend that, because of "the statutory duties, powers, and emoluments" given to FCA relators, relators hold a continuous position. (Id. at 39-40.) As a result, they conclude that a relator maintaining a lawsuit without being appointed by the President, "Courts of Law," or "Heads of Departments" violates the Appointments Clause. (Id. at 41 (quoting U.S. Const. art. II § 2, cl. 2).)[8]

The United States counters that relators do not hold a continuing office because "[r]elators' roles . . . are limited in time and scope rather than continuing from officeholder to

[8] Notably, the primary authority relied on by Defendants, United States ex rel. Zafirov v. Fla. Med. Assocs., LLC, 751 F. Supp. 3d 1293 (M.D. Fla. 2024), has been vacated and remanded by the Eleventh Circuit. See United States v. Fla. Med. Assocs., LLC, No. 24-13581, 2026 WL 2581886 (11th Cir. Sept. 1, 2026).

officeholder over time[.]" (Doc. 51 at 5.) Further, they contend that relators are not Officers of the United States because of the governmental control over "whether the action should go forward, and, if so, who should litigate it." (Id. at 10.) Relator also argues that the qui tam provisions of the FCA are constitutional, relying on the court's extensive analysis in United States v. JP Pharma, LLC, No. 7:19-CV-839, 2025 WL 3640892 (W.D. Va. Dec. 16, 2025), where the court upheld the constitutionality of the FCA. (Doc. 52 at 41.)

"The Appointments Clause prescribes the exclusive means of appointing 'Officers.' Only the President, a court of law, or a head of department can do so." Lucia v. Sec. & Exch. Comm'n, 585 U.S. 237, 244 (2018). To qualify as an "officer," "an individual must occupy a 'continuing' position established by law[.]" Id. at 245 (discussing United States v. Germaine, 99 U.S. 508, 511-12 (1879)). Further, an "Officer" must exercise "significant authority pursuant to the laws of the United States." Lucia, 585 U.S. at 245 (quoting Buckley v. Valeo, 424 U.S. 1, 126 (1976)).

The qui tam relator does not occupy a "continuing position." The relevant inquiry for whether an office is "a continuing one" is whether the "duties continue, though the person be changed[.]" United States v. Maurice, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (Marshall, C.J.); accord Germaine, 99 U.S. at 511-12 (holding that a surgeon was not an "officer" because duties were not "continuing

and permanent," but rather "occasional and intermittent"); Auffmordt v. Hedden, 137 U.S. 310, 326-27 (1890) (holding that a merchant who is "selected for the particular case" and was "without tenure, duration, continuing emolument, continuous duties and [acted] only occasionally and temporarily" was not an "Officer"). "Unlike a 'continuing position,' the role of a [r]elator cannot be transferred to another, even if another would have qualified as a Relator before the case was filed." JP Pharma, 2025 WL 3640892, at *23 (emphasis in original).

However, "[i]f a special prosecutor or a receiver is unable to perform their duties, a new special prosecutor or receiver is appointed in their stead." Id. This fact distinguishes the relator from the independent counsel, see Morrison v. Olson, 487 U.S. 654, 660-663 (1988), and the bank receiver, see United States v. Weitzel, 246 U.S. 533, 541 (1918). "[T]he continuing role of a special prosecutor or a receiver, while particular to a specific case, is not specific to the person who is appointed to perform them." JP Pharma, 2025 WL 3640892, at *23.

Furthermore, the relator does not exercise "significant authority pursuant to the laws of the United States[.]" Buckley, 424 U.S. at 126. To the contrary, "the executive retains significant control over litigation pursued under the FCA by a qui tam Relator." Riley, 252 F.3d at 753. As representative examples, (1) a private action "may be dismissed only if the . . . Attorney

General give[s] written consent to the dismissal[,]" 31 U.S.C. § 3730(b)(2); (2) "[i]f the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action[,]" id. § 3730(c)(1) (emphasis added); (3) the government "may settle the action notwithstanding the objections of the" relator; (4) the government may dismiss the action notwithstanding the objections of the relator, id. § 3730(c)(2)(A), and will be able to do so "in all but the most exceptional cases[,]" United States, ex rel. Polansky v. Exec. Health Res., Inc., 599 U.S. 419, 437 (2023); and (5) the relator can proceed with the action only if "the Government elects not to proceed with the action," and even then, the government may "nevertheless . . . intervene at a later date upon a showing of good cause." id. § 3730(c)(3).

These provisions, among others, make it clear that "[t]he government . . . retains the first (and sometimes, the second or third) bites at controlling an FCA civil case brought by a Relator." JP Pharma, 2025 WL 3640892, at *24. The relator stays as a "private person[,]" 31 U.S.C. § 3730(b), and the FCA does nothing to "make the Relator anything other than a private person, much less" an official of the United States. Cochise Consultancy, Inc. v. United States ex rel. Hunt, 587 U.S. 262, 272 (2019).

For these reasons, the court holds that the qui tam provisions

of the FCA do not violate the Appointments Clause of the Constitution.

### 2. Whether the Qui Tam Provisions of the FCA Violate the Vesting and Take Care Clauses

Defendant further argues that the qui tam provisions of the FCA violate the Vesting and Take Care Clauses of the United States Constitution. (Doc. 46 at 42.) First, they contend that the FCA's qui tam provisions vest executive power in relators by allowing them to "decide which specific claims and legal theories to assert[,]" while binding the United States to a judgment. (Id. at 43.) Next, they contend that the qui tam provisions "trespass far beyond the outermost limits [on restrictions of the Executive's power] set forth in" Morrison, 487 U.S. 654. (Doc. 46 at 47.)

The United States counters by pointing to "the extensive body of evidence that qui tam provisions have, since the Founding, been understood as established features of American law." (Doc. 51 at 12.) The government points to qui tam provisions passed by the First Congress as evidence that "the Framers viewed [qui tam statutes] as fully compliant with Article II of the Constitution." (Id. at 13-14.) Further, the government contends that the FCA provides for greater means of governmental control than early qui tam statutes, which were held constitutional. (Id. at 15.)

Article II provides that "[t]he executive Power shall be vested in a President of the United States[,]" U.S. Const. art.

II § 1, who "shall take Care that the Laws be faithfully executed[.]" U.S. Const. art. II § 3. The issue in this case is whether the qui tam provisions of the False Claims Act "accord the Executive Branch 'sufficient control' over the conduct of Relators to 'ensure that the President is able to perform his constitutionally assigned duties.'" U.S. ex rel. Kelly v. Boeing Co., 9 F.3d 743, 751 (9th Cir. 1993) (quoting Morrison, 487 U.S. at 696).

As discussed above, under the FCA, the government maintains "significant power . . . over a qui tam case." JP Pharma, 2025 WL 3640892, at *25; see also infra. Defendants argue that prior federal court decisions upholding the FCA's constitutionality are no longer persuasive because they "are inconsistent with more recent Supreme Court precedent, including Morrison, which they contend marks the 'outermost constitutional limits' on restrictions of the Executive's powers." (Doc. 46 at 46 (quoting Seila L. LLC v. Consumer Fin. Prot. Bureau, 591 U.S. 197, 218 (2020)).) However, the qui tam relator raises fewer Article II questions than the independent counsel did in Morrison, making it difficult to believe it trespasses the "outermost constitutional limits" set out in Seila Law. See 591 U.S. at 218 (quoting PHH Corp. v. Consumer Fin. Prot. Bureau, 881 F.3d 75 (D.C. Cir. 2018) (Kavanaugh, J., dissenting), abrogated by Seila Law, 591 U.S. 197).

As explained by the Fifth Circuit in Riley, the independent counsel in Morrison is unlike the qui tam relator in two ways. First, while the Ethics in Government Act at issue in Morrison "assign[ed] the independent counsel to act as the United States itself[,]" the FCA "only authorize[s] the relator to bring a lawsuit in the name of the United States." Riley, 252 F.3d at 755 (emphasis added). Second, the independent counsel "undertake[s] functions relevant to a criminal prosecution, [whereas] relators are simply civil litigants." Id. While "[t]he prosecution of criminal cases has historically lain close to the core of the Article II executive function[,]" id., historical practice has demonstrated that the Framers did not think civil qui tam litigation violated Article II. See id. at 752 (observing that the Founding Fathers and First Congress enacted numerous statutes authorizing qui tam actions); Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens, 529 U.S. 765, 777 n.5 (2000) (noting that the First Congress passed a statute "allowing injured parties to sue for damages on both their own and the United States' behalf").

While Defendants point out that "a Relator need not seek [government] approval to initiate a qui tam action[,]" (Doc. 46 at 45), the Relator does not have the right to conduct the action until the Government elects not to proceed with the action. See 31 U.S.C. § 3730(c)(3). Likewise, while Defendants contend that "the [Department of Justice] cannot control which allegations,

claims, or theories a Relator may choose to assert[,]" (Doc. 46 at 45), this only occurs if "the government . . . chose not to intervene . . . [and] [i]n any event, the government can change its mind and intervene with good cause." JP Pharma, 2025 WL 3640892, at *25 (emphasis in original) (citing 31 U.S.C. § 3730(c)(3)).

For these reasons, the court concludes that the qui tam provisions of the FCA "accord the Executive Branch 'sufficient control' over the conduct of Relators to 'ensure that the President is able to perform his constitutionally assigned duties.'" Kelly, 9 F.3d at 751 (quoting Morrison, 487 U.S. at 696). Accordingly, the court finds that the FCA qui tam provisions do not violate the Vesting or Take Care Clauses.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Defendants' motion to dismiss (Doc. 46) is GRANTED as follows:

1. As to all claims against Universal Health Services, and those claims are DISMISSED.
2. As to all claims outside January 2016 to June 2020 at Old Vineyard, and those claims are DISMISSED.
3. As to all claims under the FCA and NCFCA relating to false Medicaid and Tricare claims, and those claims are DISMISSED WITHOUT PREJUDICE.

4. As to all claims under the FCA and NCFCA relating to IOP services allegedly billed to Medicare, and those claims are DISMISSED.

5. As to all claims under the FCA and NCFCA stemming from alleged (1) improper and excessive stays, (2) improper nursing assessments, (3) missing documentation in the outpatient unit and missing admission orders, and (4) alleged emails, and those claims are DISMISSED.

In all other respects, the motion to dismiss is DENIED.

/s/ Thomas D. Schroeder
United States District Judge

September 25, 2026